Richard C. Giller (SBN 117823)
Email: rgiller@reedsmith.com
REED SMITH LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080

Attorney for Plaintiffs
ABRAHAM STUART RUBIN and
ANNETTE RUBIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABRAHAM STUART RUBIN and ANNETTE RUBIN,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE NUMBER SRD526993,<br><br>　　　　　Defendant. | Case No: 2:17-cv-00126<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; and**<br>3. **DECLARATORY RELIEF**<br><br>[JURY TRIAL REQUESTED] |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Plaintiffs, Abraham Stuart Rubin and Annette Rubin alleges as follows:

## NATURE OF THIS ACTION

1. Plaintiffs, Abraham Stuart Rubin ("Stuart Rubin") and Annette Rubin (collectively "Plaintiffs" or "the Rubins"), bring this lawsuit against Defendant Certain Underwriters at Lloyd's, London subscribing to Certificate Number SRD526993 ("Lloyd's") because, among other things, Lloyd's: (a) wrongfully denied insurance coverage for this clearly covered loss; (b) wrongfully refused to fully reimburse the Rubins for this clearly covered loss; (c) unreasonably failed to view the evidence submitted by the Rubins in the light most favorable to providing coverage for the loss, as it was required to do but, instead, improperly viewed the evidence solely through the lens of creating an artifice for denying coverage; and (c) breached the implied covenant of good faith and fair dealing in numerous ways.

## A DESCRIPTION OF THE PARTIES

2. Plaintiffs are, and at all times relevant hereto were, residents of the State of California, County of Los Angeles.

3. Based upon information and belief, Defendant Lloyd's is, and at all times relevant hereto was, a foreign entity that offers property and casualty insurance products to individuals and businesses. The principal offices of Lloyd's are located in London, England.

4. Based upon information and belief, Lloyd's was, at all relevant times hereto, authorized to transact the business of insurance in the State of California, and has transacted insurance business as such in this State and this judicial district and has substantial commercial contacts and impact within this State and this judicial district.

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332 (a) (2) because there is complete diversity of the citizenship of the

– 1 –
COMPLAINT FOR DAMAGES

1 parties and the amount in controversy is greater than $75,000, exclusive of interest, attorney fees, and costs.

6. This Court has personal jurisdiction over Lloyd's because, among other reasons, the Subject Policy of insurance (described more fully below): (a) was to be performed by Lloyd's, in whole or in part, within this State and this judicial district; (b) insured real and personal property located within this State and this judicial district; (c) was procured through a broker licensed to do business in this State; (d) insures the Plaintiffs and their real and personal property some of which is located within this judicial district; and (e) provides that Lloyd's shall submit to the jurisdiction of a court of competent jurisdiction within the United States.

7. Further, the Rubins bring this declaratory judgment action pursuant to 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, to determine an actual case or controversy regarding a claim for benefits seeking a determination of the rights and obligations pertaining to the Subject Policy which was issued in this State and this judicial district.

8. Venue is proper in this judicial district, and division, pursuant to 28 U.S.C. §§ 1391 (a), (b) (2), and (c) because a substantial part of the events and giving rise to this claim occurred and/or a substantial part of property that is the subject of the action is situated in this judicial district and Lloyd's transacts insurance business in this judicial district.

**GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

9. In 2007, the Rubins entered into a written bailment agreement with Custom Design Storage, Inc. ("CDS"), a so-called "white-glove" warehouse storage facility that specialized in the storing of high-end furniture, one-of-a-kind items and antiques.

10. Pursuant to that bailment agreement CDS agreed, for a fee, to accept delivery of and to store in a secure facility (and/or pick up and store), brand new and one-of-a-kind pieces of furniture, artwork, fabric, exercise equipment, pillows,

COMPLAINT FOR DAMAGES

1 bedding and other furnishings and personal property owned by Plaintiffs shipped
2 directly to CDS from vendors and/or picked up by CDS.  At no point did the Rubins
3 ever have physical possession of or an opportunity to enjoy the vast majority of the
4 stored items.

5       11. For the eight-year period between 2007 and 2015, Stuart and Annette
6 Rubin timely paid to CDS monthly storage fees totaling nearly $200,000.  The Rubins
7 were, in all likelihood, one of CDS' most faithful and loyal customers during that time
8 period.

9       12. The Rubins stored hundreds of items at CDS in 29 vaults, each
10 measuring 7-feet by 5-feet by 8-feet tall, as well as the on numerous rack shelving in
11 the CDS storage facility.

12       13. Although CDS had possession of hundreds of pieces of brand new or
13 highly collectible items owned by the Rubins, CDS had absolutely no conceivable
14 right to title nor any legitimate claim of ownership over any of the stored items.

15       14. In or about May 2015, plaintiff Annette Rubin sought to retrieve certain
16 items stored by CDS but she was met with months of delay and stall tactics.

17       15. As soon as the steady income-stream the Rubins had been providing to
18 CDS (and that CDS had enjoyed for eight years) was in danger of ending, CDS began
19 a systematic campaign to delay and stall the inevitable end of the storage
20 facility/customer relationship.

21       16. For the period between May 2015 through October 2015, Annette Rubin
22 placed scores of telephone calls, sent numerous text messages and emails to CDS and
23 one of its owners, James Deely, requesting access to Plaintiffs' stored belongings in
24 anticipation of having those items removed from storage and delivered to the Rubins,
25 all with no success.

26       17. CDS' stall tactics between May and October 2015 now appear to have
27 been either or both a feeble attempt to continue bilking the Rubins for storage fees
28

– 3 –
COMPLAINT FOR DAMAGES

1 and/or an attempt to forestall the inevitable discovery of CDS' theft of the stored
2 property.

3     18.    Between May and October 2015 CDS admitted to the Rubins that it was
4 in desperate need of money and was losing its lease for the Culver City storage
5 facility.

6     19.    In October 2015 -- 5 months after Annette Rubin first began seeking the
7 return of her furnishings -- Plaintiff Stuart Rubin received a call from Glen Posey,
8 another CDS owner, and someone with whom neither of the Plaintiffs had ever dealt
9 before.

10     20.    After months of repeated and multiple unsuccessful attempts by Mrs.
11 Rubin to secure delivery of every stored item, and at a time when CDS was fully
12 aware it no longer possessed all of the items entrusted to it by the Rubins in their
13 original, pristine condition, Mr. Posey demanded from the Rubins payment of $7,500
14 in additional fees.

15     21.    Plaintiff Stuart Rubin vigorously disputed that any additional fees were
16 owed or warranted and, in response to that position, Mr. Posey threatened not allow
17 the Rubin's access to their property if the disputed storage fees were not immediately
18 paid in full.

19     22.    As an accommodation and in an attempt to secure the return of Plaintiffs'
20 furnishings, Stuart Rubin agreed to pay one-half of the disputed fees and asked that
21 the items be immediately delivered to the Rubins and Mr. Posey agreed.

22     23.    Despite this additional payment of disputed fees in return for the
23 immediate delivery of Plaintiffs' stored items, CDS failed to deliver the items.

24     24.    Mr. Rubin offered to send his own trucks to the CDS storage facility to
25 pick up the items the Rubins were storing there but Mr. Posey refused that expedited
26 process as well.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 4 –
COMPLAINT FOR DAMAGES

25. Thereafter, Mr. Posey advised Mr. Rubin that CDS was moving storage locations and the company was moving all of the stored items from Culver City to Gardena.

26. The Rubins never agreed to such a move and, given the proximity of Culver City to the Rubins home, it made no logical sense for CDS to move the 29 vaults of stored items owned by the Rubins in a multi-stage/multi-step process from Culver City to Gardena and then to the Rubins home in Beverly Hills, rather than simply delivering the items directly to the Rubins from Culver City. That is unless, at the time CDS lost its Culver City lease, CDS was fully aware that it no longer possessed all of the items entrusted to it by the Rubins in their original, pristine condition.

27. Based upon Mr. Posey's announcement that CDS was moving the Rubins' items from Culver City to Gardena, it appears that some of the items may still have been in the possession of CDS at the time or, at a minimum, Mr. Posey wanted the Rubins to believe that CDS was still in possession of their furnishings.

28. Between November 2015 and January 2016, CDS delivered some furniture to the Rubins, but over 150 items owned by the Rubins and stored at CDS were either never delivered to the Rubins or they were so damaged that they could only be considered a total loss.

29. The oft-repeated admissions by CDS regarding its woeful financial condition, combined with the inability of CDS to deliver to the Rubin's thousands of pounds of brand new and one-of-a-kind items, logically support the conclusion that it is more likely CDS sold or exchanged the highly sellable, high-end, brand new or unique furnishings to cover some of its mounting debt rather than any alternate explanation for the loss.

30. In short, thousands of pounds of stored items do not simply disappear or vanish into thin air.

31. On May 31, 2016, Annette Rubin filed a lawsuit against CDS and its two co-owners (hereinafter the *CDS Litigation*) in an attempt to recoup all or some of the losses.

32. During the process of *CDS Litigation*, the Rubins and their counsel kept Lloyd's fully apprised and updated as to the ongoing status of that litigation.

33. Counsel for Mrs. Rubin in the *CDS Litigation* repeatedly invited counsel for Lloyd's to participate and engage in settlement and mediation discussions in the *CDS Litigation* including participating in the wording of the final settlement agreement reached in that case.

34. Despite this repeated requests to participate in the *CDS Litigation*, counsel for Lloyd's repeatedly and steadfastly outright refused to participate in any and all alternative dispute resolution processes and proceedings.

35. Having refused the repeated invitations to participate in the settlement and mediation discussions in the *CDS Litigation*, Lloyd's has waived the right to contest any aspect of the settlement reached in that case.

## THE LLOYD'S INSURANCE COVERAGE

36. Lloyd's issued to the Rubins two consecutive annual "High-Value Homeowners 3" insurance policies (written on ISO Form HO 00 03 10 00). Both policies bear Certificate Number SRD526993. The first policy covers the periods May 25, 2015, to May 25, 2016 (SRD526993R1) along with a renewal of that policy covering the period May 25, 2016, to May 25, 2017 (SRD526993R2). The two policies are identical in all material respects and, therefore, for purposes of this complaint they will be referred to hereinafter simply as the "Subject Policy." A true and correct copy of the 2016-2017 policy letter is attached hereto as Exhibit "A."

37. The limit of liability for the Personal Property Coverage for the 2016-2017 policy is $5,948,130.

38. Pursuant to Section I ("Property Coverages"), Coverage C ("Personal Property") of the Subject Policy, Lloyd's agreed to "cover personal property owned or used by an 'insured' while it is anywhere in the world."

39. There is no dispute here that all of the personal property at issue was owned by Plaintiffs.

40. Pursuant to Section I ("Perils Insured Against"), Coverage C ("Personal Property") of the Subject Policy, Lloyd's agreed to pay for loss of personal property caused by any of fifteen (15) listed perils including, among others, the perils of "Vandalism or Malicious Mischief" (peril number 8) or "Theft" (peril number 9).

41. The peril of "Vandalism or Malicious Mischief" is not further described in that coverage part nor are those terms defined anywhere else in the Subject Policy.

42. With respect to coverage for the "Theft" peril, Coverage C, Peril 9 states:
   "This peril ['Theft'] includes <u>attempted theft</u> and <u>loss of property from a known place when it is likely that the property has been stolen</u>." (Peril 9, sub-part a.; emphasis added)

43. Besides the above-quoted description of "Theft" as including "attempted theft" and "likely theft," the term "Theft" is not defined anywhere else in the Subject Policy.

44. Pursuant to the express language of the "Theft" peril under Coverage C, insurance applies to any of the following causes of loss: (a) actual theft; (b) attempted theft; and (c) in circumstances where the cause is unknown, when the loss is "likely" because "the property has been stolen."

45. Pursuant to an endorsement entitled "Personal Property Replacement Cost Loss Settlement," the Subject Policy affords full replacement cost coverage "without a deduction for physical depreciation," for any damage to or loss of personal property. Here, the Rubins are entitled to full replacement cost coverage with respect to all of the personal property at issue without any rededuction for depreciation.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 7 –
COMPLAINT FOR DAMAGES

# THE TENDER OF THE LOSS TO LLOYD'S
# AND RELEVANT RESPONSES

46. The Rubins timely notified Lloyd's of this loss and, on June 1, 2017, provided Lloyd's with a 30+ page list of the items CDS either failed to deliver to the Rubins or that were so damaged by CDS as to constitute a total loss.

47. On June 14, 20017, counsel for Lloyd's responded to the tender of this Claim with a 25-page letter in which Lloyd's purports to reserve the right to deny coverage for the claim. However, a closer review of that correspondence reveals that the "reservation of rights" is, in actuality, tantamount to an outright denial of coverage and should be treated as such.

48. By that letter, Lloyd's failed to view the evidence submitted by the Rubins in the light most favorable to providing coverage for the loss, as it is required to do but, instead, viewed the evidence solely through the lens of creating an artifice for denying coverage.

49. The June 14 denial letter only recites those facts and allegations that Lloyd's contends support a denial of coverage while completely ignoring all of the facts supporting coverage under the subject policy.

50. The clear intention on the part of Lloyd's to deny coverage outright for this loss, rather than simply reserving the right to do so, is found throughout the June 14 correspondence including in the following passages, among others:

    a. "[T]he specified peril of Theft does not exist based upon the allegations of the Complaint and the discovery provided to date, including the depositions of John Deely of CDS and Annette Rubin."

    b. The "evidence evaluated to date … do[es] not amount to Theft as interpreted by the *Barnett* case."

    c. "[C]onversion is [not] the same as the specified peril of Theft under the Policy. Neither tort requires a criminal intent in the initial

        taking as does the Theft peril. Neither tort requires intent to permanently deprive as does the Theft peril."

51. The analysis performed by Lloyd's is based on a biased analysis of the evidence presented to Lolyd's and slanted in a way as to attempt to avoid coverage such that the June 14 letter constitutes an outright, and wrongful, denial of coverage.

52. By its 25-page denial letter, Lloyd's only identified a single basis upon which it was denying coverage; *i.e.*, the claim that the loss did not constitute a covered peril and, specifically, that it did not constitute (a) actual theft; (b) attempted theft; or (c) in circumstances where the cause is unknown, the "likely" cause of the loss is because the property has been stolen.

53. The only other insurance coverage issue addressed by Lloyd's in its 25-page denial letter is its unreasonable reliance on Section I ("Property Coverage"), Coverage C ("Personal Property"), sub-part 2 ("Limit for Property At Other Residences") -- a completely inapplicable policy provision -- to attempt to limits its exposure.

54. Pursuant to the "Limit for Property At Other Residences" provision:
    "[The] limit of liability for personal property <u>usually located at an 'insured's' residence other than the 'residence premises'</u>, is 10% of the limit of liability for Coverage C."

55. Despite the fact that (a) the Subject Policy explicitly covers personal property "while it is anywhere in the world" and (b) the vast majority of the items at issue were never -- and certainly not "usually" -- located at any residence owned by the Rubins, Lloyd's claimed in its denial letter that "the limit of liability [for the subject loss] is $594,813 (10% of $5,948,130 = $594,813). Underwriters disclaim coverage to the extent the personal property loss being claimed exceeds the limit of $594,813." Such a claim is wholly misplaced.

56. Here, the vast majority of the items at issue were shipped directly from vendors to the CDS storage facility (or items were picked up by CDS from third

1  parties) and those items were "usually located" at the CDS storage facility for eight
2  years rather than the insured residence of any other residence premises.  As a result,
3  the relied upon 10% limitation has absolutely no application here.

4      57.   The attempt by Lloyd's to limit its exposure based upon this wholly
5  inapplicable policy provision is unreasonable and was made in bad faith.

6      58.   By letter dated October 16, 2017, counsel for the Rubins' provided a
7  response to the wrongful denial of coverage.  A true and correct copy of the 10/16/17
8  letter is attached hereto as Exhibit "B." On October 16, 2017, the Rubins also
9  provided a Sworn Proof of Loss to Lloyd's pursuant to an agreed upon extended
10 submission deadline.

## **FIRST CLAIM FOR RELIEF**
### **(Breach of Contract against All Defendants)**

13     59.   The Rubins re-allege and incorporate by reference, each and every
14 allegation set forth in paragraphs 1 through 58 inclusive above, as though they are set
15 forth in full.

16     60.   The Rubins have fully complied with and have performed all of the
17 conditions and covenants on their part to be performed under the Subject Policy.

18     61.   Lloyd's breached the Subject Policy in a number of ways including,
19 without limitation, the following:

    a.  Failing and refusing to pay any part of the loss suffered by the
        Rubins;
    b.  Failing and refusing to pay 100% of the loss suffered by the
        Rubins without depreciation;
    c.  Failing to properly investigate the Rubins' claim;
    d.  Failing to view the testimony and documentary evidence submitted
        by the Rubins in the light most favorable to providing coverage for the
        loss, as Lloyd's was required to do;

e. Viewing, in bad faith, the evidence provided through the lens of creating an artifice for denying coverage rather than supporting coverage;

f. Completely and inexplicably ignoring all of the evidence establishing that "theft" was the likely cause of the loss;

g. Placing its own financial interests ahead of the financial interests of the Rubins; and

h. Breaching the implied covenant of good faith and fair dealing as more fully detailed below.

62. Here, the totality of the circumstances support a conclusion that theft was the likely cause of the missing items include the following facts that Lloyd's completely ignored when denying coverage: (a) the poor financial condition of CDS; (b) the fact that CDS was in dire need of money and had lost its lease; (c) the undisputed evidence that CDS stole money from the Rubins by charging amounts without proper authorization; and (d) the size, volume, new condition and value of the items CDS failed to deliver all militate in favor of theft.

63. The Rubins have been damaged, in an amount to be established at trial, as a direct and proximate result of the above listed contract breaches (and others) committed by Lloyd's.

## SECOND CLAIM FOR RELIEF

## (Breach of the Implied Covenant of Good Faith
## and Fair Dealing against Lloyd's)

64. The Rubins re-allege and incorporate by reference, each and every allegation set forth in paragraphs 1 through 63 inclusive above, as though they are set forth in full.

65. Implied in the Subject Policy is a covenant that Lloyd's would act in good faith and deal fairly with the Rubins. That obligation includes, among other things, an obligation that Lloyd's would not do anything to interfere with the Rubins' rights to receive the protection and benefits due and owing under the Subject Policy

and that Lloyd's would give as much, if not more, consideration to the Rubins' interest as Lloyd's gave to its own interests in responding to this loss.

66. Instead of complying with these duties and obligations, Lloyd's has acted in bad faith by, among other things, unreasonably, without good cause, and in bad faith:

  a. Failing to view the testimony and documentary evidence submitted by the Rubins in the light most favorable to providing coverage for the loss, as Lloyd's was required to do;

  b. Viewing, in bad faith, the evidence provided through the lens of creating an artifice for denying coverage rather than supporting coverage;

  c. Completely ignoring all of the evidence establishing that "theft" was the likely cause of the loss;

  d. Placing its own financial interests ahead of the financial interests of the Rubins;

  e. Refusing and failing to promptly investigate and resolve the Rubins' claim;

  f. Engaging in a systematic and orchestrated effort to stall, delay and stonewall payment of the Rubin' claim;

  g. Wrongfully attempting to limit coverage to 10% of the policy limits based upon a policy provision that is wholly and undisputedly inapplicable to the facts of this claim;

  h. Basing the denial of coverage almost exclusively on a single case which is so factually distinguishable as to render its recitation in and of itself bad faith;

  i. Failing to promptly and properly investigate the Rubins' claim with an eye towards honoring its contractual obligations while stringing the Rubins along with false claims that the June 14, 2017 denial letter

was not, in fact a denial: "This does not mean that their claim is or even will be denied;" when the substance of that letter belies such a position;

j. Failing to timely and properly initiate, conduct, and conclude its investigations regarding its coverage obligations to the Rubins;

k. Failing to state proper and adequate bases for denying coverage and, instead, asserting potential grounds for denying or limiting coverage based on assertions contrary to the facts, the law, insurance industry custom and practice, and the reasonable expectations of the Rubins as policyholders;

l. Placing financial interests of Lloyd's ahead and above those of the Rubins by ignoring applicable law, and failing to assist the Rubins; and

m. Otherwise acting contrary to the obligations imposed by the implied covenant of good faith and fair dealing in the Subject Policy.

67. In breach of the implied covenant of good faith and fair dealing, Lloyd's did the things and committed the acts alleged above for the purpose of consciously withholding from the Rubins the rights and benefits to which the Rubins are entitled under the Subject Policy.

68. The acts described above by Lloyd's are (a) inconsistent with the reasonable expectations of the Rubins; (b) contrary to established claims practices and legal requirements; (c) contrary to insurance industry custom and practice; (d) contrary to the express terms of the Subject Policy; and (e) constitute bad faith.

69. As a direct and proximate result of the unreasonable and bad faith conduct of Lloyd's, the Rubins have suffered, and will continue to suffer, damages under the Subject Policy, plus interest, and other economic and consequential damages, in a total amount to be shown at the time of trial.

70. The conduct by Lloyd's is despicable and outrageous, and was done with a conscious disregard of the rights and reasonable expectations of the Rubins,

constituting oppression, fraud, and/or malice. Lloyd's engaged in the acts cited herein for the sole purpose of improperly denying benefits due under the Subject Policy.

71. Specifically, by acting as alleged above, in light of the information, facts, and relevant law to the contrary, Lloyd's consciously disregarded the rights of the Rubins.

72. By doing these things, Lloyd's wrongfully deprived the Rubins of the benefit of the policy and inflicted substantial damage on the Rubins. Lloyd's ignored the interests and concerns of the Rubins, with the requisite intent to injure within the meaning of the California Civil Code Section 3294. Therefore, the Rubins are entitled to recover punitive damages from Lloyd's in an amount that is sufficient to punish and make an example of Lloyd's and in order to deter similar conduct by Lloyd's in the future.

73. Additionally, pursuant to the holding in *Brandt v. Superior Court* (1985) 37 Cal.3d 813, the Rubins are entitled to recover all of the costs, expenses, and attorneys' fees reasonably incurred by the Rubins to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by Lloyd's. When the precise amounts of these costs, expenses and fees are known, the Rubins will seek leave of Court to amend this complaint.

### THIRD CLAIM FOR RELIEF
**(Declaratory Relief against Lloyd's)**

74. The Rubins re-allege and incorporate by reference, each and every allegation set forth in paragraphs 1 through 73 inclusive above, as though they are set forth in full.

75. An actual controversy has arisen and now exists between the Rubins on the one hand and Lloyd's on the other with respect to whether the Rubins are entitled to recover 100% of the damages listed on their Proof of Loss under the Subject Policy.

76. As to this controversy, the Rubins requests that the Court make and enter a binding judicial declaration that:

      a.    Lloyd's is obligated to pay to the Rubins 100% of the damages listed on their Proof of Loss under the Subject Policy;

      b.    The limit of liability for the Personal Property Coverage for the 2016-2017 policy is $5,948,130.

      c.    The Subject Policy provides coverage for "personal property owned or used by an 'insured' while it is anywhere in the world."

      d.    Under the Subject Policy, Lloyd's agreed to pay for loss of personal property caused by any of fifteen (15) listed perils including, among others, the perils of "Vandalism or Malicious Mischief" (peril number 8) or "Theft" (peril number 9).

      e.    Under the "Theft" peril, the express language of the insuring agreement extends to: (a) actual theft; (b) attempted theft; and (c) circumstances where the cause is unknown but where it is "likely" that the property had been stolen.

      f.    The Rubins are entitled to recover the full "replacement cost [of the items] at the time of loss without a deduction for physical depreciation";

      g.    Section I ("Property Coverage"), Coverage C ("Personal Property"), sub-part 2 ("Limit for Property At Other Residences") of the Subject Policy has no application here;

      h.    No exclusions apply to bar coverage; and

      i.    The Rubins have fully complied with all requirements under the Subject Policy.

77. The requested declarations are both necessary and proper at this time under the circumstances in that the interests of judicial economy and substantial justice will be served thereby.

78. The Rubins are informed and believes, and upon that basis alleges, that Lloyd's disputes all or part of the contentions set forth in the preceding paragraphs.

79. The Rubins seeks a judicial declaration as set forth above.

## PRAYER FOR RELIEF

**WHEREFORE**, the Rubins prays for judgment as follows:

### ON THE FIRST CLAIM FOR RELIEF

1. For damages, plus interest, according to proof at the time of trial;

### ON THE SECOND CLAIM FOR RELIEF

2. For damages, plus interest, according to proof at the time of trial;

3. For the amount of reasonable attorneys' fees and expenses incurred by the Rubins to obtain the benefits due to him under the Subject Policy, plus interest, according to proof at the time of trial;

4. For punitive damages in an amount to be determined at trial;

### ON THE THIRD CLAIM FOR RELIEF

5. For the declarations set forth in that claim;

### ON ALL CLAIMS FOR RELIEF

6. That judgment be entered in favor of the Rubins and against Defendants and each of them;

7. For costs of suit incurred herein; and

8. For such other, further, and/or different relief as may be just and proper.


DATED:  October 17, 2017

            REED SMITH LLP

            By: s/Richard C. Giller
                Richard C. Giller (SBN 117823)
                Attorneys for Plaintiffs
                ABRAHAM STUART RUBIN and
                ANNETTE RUBIN